**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **JACOB G.[1] O/B/O** ) | |
| **G.G., a minor child,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 7:18-cv-15** |
| ) | |
| **NANCY A. BERRYHILL,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff  Jacob G. ("Jacob"), on behalf of G.G., a minor child, filed this action

challenging the final decision of the Commissioner of Social Security ("Commissioner") finding

G.G. not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the

Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Jacob alleges that the Administrative Law

Judge ("ALJ") erred by finding that: (1) G.G. does not suffer from a severe impairment that

functionally equals a listed condition, as substantial evidence does not support the ALJ's findings

regarding functional domains two, five, and six; and (2) G.G.'s parents' subjective allegations of

impairment are not entirely credible.

I conclude that substantial evidence does not support the ALJ's decision. Accordingly, I

**RECOMMEND GRANTING** Jacob's Motion for Summary Judgment (Dkt. 15), **DENYING**

the Commissioner's Motion for Summary Judgment (Dkt. 20), and **REMANDING** the case for

further consideration by the ALJ.

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration
and Case Management of the Judicial Conference of the United States that courts use only the first name and last
initial of the claimant in social security opinions.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that G.G. failed to demonstrate that he was disabled under the Act. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at [her] conclusions"); see also Monroe v. Colvin, 826 F.3d 176, 188 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to [her] conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted). In Mascio and Monroe, the Court of Appeals remanded because the ALJ failed to adequately explain how he arrived at conclusions regarding the claimant's RFC. Mascio, 780 F.3d at 636; Monroe, 826 F.3d at 189. Similarly, I find that remand is appropriate here because substantial evidence does not support each of the ALJ's conclusions regarding G.G.'s domains of functioning and, thus, the Court is unable to review her decision.

## CLAIM HISTORY

G.G.'s parents applied for SSI on his behalf in December 2013, when he was

approximately 11 months old, claiming that G.G. was disabled since his birth on March 14, 2013. R. 608. They alleged G.G. was disabled due to sleep apnea, involuntary movement, physical delay, loss of consciousness, low muscle mass, water on the brain, toe walking, and hypospadias. Id. The state agency denied G.G's application at the initial and reconsideration levels of administrative review. R. 608–15, 617–26. On July 28, 2016, ALJ Geraldine H. Page held a hearing to consider G.G.'s claim for SSI. R. 334–46. Counsel did not represent G.G. at the hearing, and Susan G., G.G.'s mother, testified on G.G.'s behalf. R. 334. On February 8, 2017, the ALJ entered her decision analyzing G.G.'s claim under the three-step process for individuals under age eighteen and denying his claim for benefits. R. 63–86.

Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Social Security regulations provide a three-step sequential evaluation process for determining whether a minor is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is not disabled. Id. § 416.924(a), (b). Next, the ALJ must determine whether the claimant suffers from "an impairment or combination of impairments that is severe"; if not, the claimant is not disabled. Id. § 416.924(a), (c). To qualify as a severe impairment, the impairment must cause more than a minimal effect on the claimant's ability to function. Id. § 416.924(c). If an impairment is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then it is not severe. Id. If the claimant has a severe impairment, the analysis progresses to step three, where

the ALJ must consider whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listing. Id. § 416.924(a), (d). If the claimant has such an impairment, and it meets the durational requirement, the claimant is disabled. Id.

In her decision, the ALJ concluded that G.G. was not engaging in substantial gainful activity. R. 66. She determined that G.G. has the severe impairments of mild pediatric obstructive sleep apnea, encephalopathy, developmental delays, and cerebral palsy. Id. The ALJ found that G.G. had other medically determinable impairments, including arachnoid cyst, otitis media, and bronchitis, but that those impairments are episodic or controlled by medication. Id. Finally, the ALJ determined that G.G. does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Id. The ALJ specifically considered listings 103.02 (chronic respiratory disorders), 111.00 (neurological disorders), 111.07 (cerebral palsy), 112.14 (developmental disorders in infants and toddlers), and 112.11 (neurodevelopmental disorders, since age three). R. 67.

The ALJ determined that G.G. does not have an impairment or combination of impairments that functionally equals the severity of the listings. Id. When conducting this "step three" analysis, the ALJ must consider the following six relevant domains[2] of functioning to determine whether a severe impairment functionally equals a listed condition: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). For a claimant to be found disabled, marked limitations must be assessed in at least two domains or an extreme limitation assessed in one domain. Id. § 416.926a(a). "Marked" limitation is defined as "more than moderate" but "less than extreme."

---

[2] The domains "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).

Id. § 416.926a(e)(2)(i). A minor has a "marked" limitation in a domain when his impairment(s) interferes seriously with his ability to independently initiate, sustain, or complete activities. Id. Extreme limitation is defined as "more than marked." Id. § 416.926a(e)(3)(i). While extreme limitation is the rating given to the worst limitations, it does not necessarily require a total lack or loss of ability to function. Id.

Regarding the six functional domains, the ALJ concluded that G.G. had: no limitation in acquiring and using information; no limitation in attending and completing tasks; no limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in the ability to care for himself; and less than marked limitation in health and physical well-being. R. 79–85. Thus, the ALJ concluded that G.G. was not disabled. R. 86. The Appeals Council denied G.G.'s request for review on November 17, 2017. R. 1–4

## ANALYSIS

Jacob challenges the ALJ's determination that G.G.'s impairments do not functionally equal a listing, and specifically contests the ALJ's findings that G.G. has no limitations in the domains of attending and completing tasks and caring for himself, and less than marked limitation in the domain of health and physical well-being. Jacob also argues that substantial evidence does not support the ALJ's assessment of G.G.'s parents' subjective allegations.

### A.  Medical History

1. Physical Impairments

G.G. endured a complicated birth. His mother, Susan G., was on multiple medications for bipolar disorder during her pregnancy, and G.G. was born under stress after a difficult labor. R. 979. Susan reported that G.G. suffered damage to the white matter of his brain during delivery because he was deprived of oxygen. R. 779. At the hearing, Susan testified that G.G. suffers

from developmental delays and regressions, sleeping issues, and frequent choking or vomiting because of his difficulties with eating. R. 339–43.

G.G.'s pediatrician in Florida (where he was born) reported that, throughout G.G.'s first year, G.G. had not met all of his milestones at four months, six months, nine months, and one year. R. 913, 920, 933, 935, 940. The earliest indication in the record of a developmental disorder appears in the notes for G.G.'s four-month wellness check in July 2013. At that time, the pediatrician referred G.G. to a neurologist because of concerns about potential seizure and development disorders. R. 913–15.

A Florida neurologist evaluated G.G. in August 2013 for suspected seizures, staring spells, and jerking of the left leg. A subsequent MRI of G.G.'s brain in August 2013 showed normal structure and myelination for his age, and benign enlargement of subarachnoid spaces. R. 949, 977. G.G. also had a normal EEG and no seizures during a sleep study. R. 977. The neurologist placed G.G. on supplements for carnitine deficiency and sleep issues. Id. At a follow-up in February 2014, the neurologist diagnosed G.G. with sleep apnea and ordered another sleep study. R. 975. However, the sleep study was not completed because G.G. made it too difficult to perform. R. 985. Another MRI was performed in April 2014, which revealed that G.G. had abnormal signal intensity around areas of white matter, suggesting a prior extensive hypoxemic/ischemic injury. R. 1043. The neurologist later determined that this was periventricular leukomalacia (PVL), which the doctor described as a static malformation of the brain and the likely the source of G.G.'s developmental delays. R. 968, 986. The MRI also showed that G.G. likely had an arachnoid cyst, but G.G. did not yet need surgery. R. 968, 1043. Overall, the neurologist noted developmental delays at almost all of G.G.'s appointments. See R. 975, 977, 980, 986. He also diagnosed encephalopathy (R. 969, 972, 975, 978, 981, 988),

apnea (R. 969, 972, 975, 978, 981, 988), developmental disorder (R. 969), lack of
coordination/periodic limb movement (R. 969, 981, 988), and PVT (R. 969, 988).

In September 2013, G.G. was evaluated for physical therapy after G.G.'s pediatrician
officially diagnosed G.G. with delayed milestones and developmental disorder. R. 856, 927. The
physical therapist determined that G.G.'s motor skills were age appropriate at that time. R. 857.
Later, in March 2014, G.G. received orthotics for his abnormal gait and toe walking. R. 935, 993.
In April 2014, G.G. was evaluated for occupational therapy ("OT"), also due to his
developmental delays. R. 903. OT was not recommended at that time because G.G. had only
some mild delays in sensory processing. R. 904. Later in 2014, G.G. was diagnosed with cerebral
palsy. R. 993–94.

G.G.'s family moved to Virginia from Florida in late 2014. In September 2014, G.G.
established care at Mountain View Pediatrics, where he was evaluated for mixed sleep apnea,
encephalopathy, cerebral palsy, feeding disorder, and speech delay. R. 1095. G.G.'s new
pediatrician referred G.G. to early intervention physical and occupational therapy for G.G.'s
walking difficulties, eating disorder, and speech delays. R. 1096. Beginning in October 2014,
G.G.'s pediatrician repeatedly assessed G.G. with developmental delays. R. 1057, 1064, 1077,
1085, 1228. For the period of September 2014 to June 2016, G.G.'s mother and pediatrician
regularly discussed G.G.'s trouble with walking (R. 1054, 1083), eating and drinking (R. 1054,
1062, 1071, 1075, 1083), and sleeping (R. 1048, 1054, 1062, 1071, 1075, 1083). They also
discussed G.G.'s behavior, impulsiveness, sensory challenges, and difficulty concentrating.
R. 1228, 1236, 1238. While his pediatrician thought that a lot of G.G.'s difficulties with
concentrating were appropriate for his age, she concluded that he still had a lot of sensory
challenges and recommended that G.G. continue with therapy. R. 1238.

G.G.'s pediatrician referred G.G. for a neurological consult to address the sleep apnea

and arachnoid cyst issues in February 2015. At the initial consultation, the neurologist

determined that G.G. had a mostly normal neurological exam for his age at the time. R. 1146–48.

G.G. also had a normal EEG, and a borderline to near normal sleep study. R. 1135–37, 1159,

1201–02. Another MRI was abnormal because the arachnoid cyst was growing, but doctors

determined that surgical intervention was not yet necessary. R. 1164, 1207. In February 2016,

the neurologist discussed G.G.'s developmental and language delays and behavioral problems,

but approved of G.G.'s occupational therapy and ongoing development. R. 1183–84.

G.G. was evaluated for occupational therapy in March 2016. At that time, the therapist

assessed him with oral dysphagia. R. 1277. The therapist noted G.G. had significant eating issues

("strangles" himself on liquids and needs to be heavily paced when eating because he overstuffs

his mouth). R. 1278. She determined that G.G. was at risk for choking and/or aspiration, and that

G.G. "must be constantly supervised when eating as he has no impulse control to manage a bolus

and will fill his mouth with a bolus until he gets choked or strangles on the liquid." R. 1279.

G.G. also received therapy for speech and peer interaction. R. 1275.

The occupational therapy records available at the time of the ALJ's decision extended

through October 2016. G.G. attended weekly therapy sessions, and the records contain numerous

mentions of G.G.'s issues with eating and drinking. G.G. had regular difficulties with: figuring

out the correct bite size (R. 1255, 1257, 1273, 1394, 1396, 1399, 1422, 1430); drinking liquids

and swallowing at an appropriate rate without coughing, choking, or "strangling himself" (R.

1251, 1257, 1259, 1273, 1380, 1388, 1392, 1430); and impulsive eating and/or over-stuffing his

mouth (R. 1251, 1255, 1257, 1271, 1273, 1388, 1392, 1394, 1396, 1399, 1401, 1416). There

were few mentions of improved eating. R. 1372, 1377. The records also contain repeated

mentions of G.G. becoming easily distracted from tasks, losing attention, having difficulty

following instructions, and needing substantial or maximum redirection to follow directions or

complete tasks. R. 1251, 1254, 1269, 1380, 1382, 1388, 1392, 1394, 1396, 1410, 1412, 1418,

1419, 1422, 1432. His therapist specifically noted that G.G. was "unable to follow through with a

simple task without constant verbal cues," and, without prompts, would not be able to complete

some simple tasks, like making a three-step craft. R. 1373, 1377, 1380, 1382, 1384. There were

some positive notes regarding G.G.'s attention and completion of tasks. R. 1405, 1408, 1410,

1424, 1426. G.G. had both good and bad reviews of his peer interaction. R. 1375, 1389.

    2.   <u>Medical Opinion Evidence</u>

    In March 2014—before G.G. moved to Virginia or began OT—Thomas Peele, M.D.,

reviewed the record for the state agency's disability determination and determined that G.G. had

only one medically-determinable impairment, specifically sleep-related breathing disorders, and

it was non-severe. R. 612. Dr. Peele concluded that G.G. was "age appropriate," and, per his

neurology exams, was "practically on target for everything." <u>Id.</u> He determined that G.G.'s

overall condition appeared to be non-severe. <u>Id.</u> While Dr. Peele did not determine it to be a

medically determinable impairment, he noted that encephalopathy was G.G.'s "principal

diagnosis" at that time. <u>Id.</u>

    As part of the reconsideration of the state agency's disability determination, James C.

Jamison, M.D., evaluated the records in July 2014, just after G.G. moved to Florida and around

the time G.G.'s new pediatrician referred him for early intervention therapy. Dr. Jamison

determined that G.G. had two medically determinable impairments: sleep-related breathing

disorder, which was non-severe, and organic mental disorders, which were severe. R. 622. Dr.

Jamison determined that G.G.'s impairments, or combination of impairments, did not meet,

medically equal, or functionally equal a listing. Id. Dr. Jamison found no limitations in any of the six domains. R. 623. Leslie Devitt, Ph. D., gave psychiatric input for domains one, two, and three. For domain one (acquiring and using information), she stated that G.G.'s only delays were in motor functioning, and he was meeting all twelve-month milestones, except for two (walking with support and having a precise pincer grasp). Id. Dr. Devitt noted simply that G.G. was able to participate in the assessment for domain two (attending and completing tasks). Id. Finally, Dr. Devitt submitted the same comments for domain three (interacting and relating with others) that she did for domain one. Id.

In December 2015 and early 2016, Smyth County Schools evaluated G.G. for potential individualized education programming or other services. Judy B. Surface, a school social worker, provided an initial sociological report. R. 778–86. Ms. Surface observed Gabriel in his home and interviewed his mother. She made a number of specific observations, including that G.G.: can walk and run, but walks on his tiptoes; favors his right side; can eat with a spoon and fork and drink out of a cup; will eat more slowly only if reminded to do so (for example, G.G. stuffed food into his cheeks and his mother had to tell him to take smaller bites); will at times choke when taking a drink; has apnea incidents at night and potentially during the day; has good vocabulary; can usually interact with adults; does not interact with children his age; has very good and also extremely challenging behavioral days; and needs assistance with getting dressed. R. 776, 784–85.

G.G. also underwent a number of other evaluations as part of that process. In February 2016, the speech and language assessment demonstrated that G.G. had decreased attention with moderate need for redirection, and needed constant redirection to task as the evaluation progressed. R. 790. The speech therapist noted that G.G. had difficulty biting and chewing food

10

completely, overstuffed his mouth, and drooled; vomited often after eating; had difficulty with food textures; and could drink from a straw only with pacing. R. 791. The therapist determined that G.G.'s language development was age appropriate. Id. A separate physical therapy evaluation concluded that G.G.'s gross motor skills were generally appropriate for his age, and PT services were not recommended. R. 795. G.G.'s OT evaluation revealed areas of concern in self-care, student interaction skills, learning, play, and graphic communication. R. 796–97. G.G. also demonstrated definite dysfunction in sensory processing, specifically with visual, hearing, touch, body awareness, and balance, along with some problems in social participation. R. 798. The therapist indicated G.G.'s sensory processing dysfunction was due to his brain being unable to filter information effectively. Id. The therapist ultimately concluded that G.G. displayed delays and deficits in fine motor skills and sensory processing dysfunction, and recommended OT services for the skill areas of self-care, student interaction, learning, play, and graphic communication. R. 799.

Finally, school psychologist Kelsey Parks completed an initial development report in March 2016. R. 807. She determined G.G.'s cognitive functioning and development to be in the average range, but G.G. had below average adaptive skills. Id. She also noted at-risk concerns for hyperactivity, withdrawal, adaptability, and overall adaptive skills (which refers to a child's abilities and functioning in daily life, including getting dressed, using the bathroom, and brushing teeth). Id. Ultimately, in March 2016, the eligibility committee determined G.G. was not eligible for special education services at that time. R. 787.

In August 2016, Roy V. Thomson, M.D., performed a consultative examination for the state agency. Dr. Thomson evaluated G.G. when he was three years and five months old. R. 1352. Dr. Thomson reported G.G.'s chief problems were restlessness, hyperness, and poor

11

social skills, along with difficulty swallowing, especially with liquids. Id. He noted G.G.'s

cerebral palsy diagnosis but observed that G.G. had a normal gait, no spasticity of an extremity,

and good coordination and mobility. Id. Dr. Thomson observed that G.G. was delayed in his

developmental milestones but had caught up with his age group. R. 1353. He stated that G.G.

was able to brush his teeth and feed and dress himself, but did not observe G.G. doing so. Id. Dr.

Thomson noted that G.G. does not like to be touched and is very restless and hyper. Id. Dr.

Thomson also indicated that G.G. was not fully potty trained. Id. Dr. Thomson described the

exam as difficult to conduct because of G.G.'s restlessness, hyperness, and aversion to touch. Id.

Dr. Thomson assessed G.G. with cerebral palsy, central sleep apnea, arachnoid cyst,

staring spell, swallowing dysfunction, ADHD, autism spectrum disorder, constipation, sleep

disturbance, allergies, and reactive airway disease. R. 1354. Regarding G.G.'s swallowing

dysfunction, he noted that G.G. is "unable to tolerate liquids without choking" and needs

"thicker products." Id. For ADHD, Dr. Thomson said G.G. exhibited the relevant signs and

symptoms, such as impulsiveness, but his attention seemed to be normal. Id. Finally, with regard

to the autism spectrum disorder, Dr. Thomson stated G.G. needed formal testing to diagnose, but

G.G. exhibited specific signs of autism, like being socially withdrawn, mean to other children,

and very sensitive to certain sounds. Id.

### B. Functionally Equal Listing of Impairments

Jacob asserts that the ALJ erred in finding that G.G.'s impairments do not functionally

equal the Listing of Impairments. Specifically, Jacob argues that the ALJ erred in finding no

limitation in domain two (attending and completing tasks), no limitation in domain five (caring

for yourself), and less than marked limitation in domain six (health and physical well-being).

Pl.'s Br. at 34, 35, 37, Dkt. 16. The Commissioner argues that Jacob impermissibly asks the

Court to reweigh the evidence relating to the domains of functioning. Def.'s Br. at 4, Dkt. 21.

    1.  <u>Brown v. Commissioner Analysis</u>

During oral argument, Jacob's counsel argued that the ALJ failed to build logical bridges from the medical record evidence to her conclusions regarding the three domains at issue. Consequently, she argued that, under <u>Brown v. Commissioner</u>, the ALJ's analysis is deficient and warrants remand. 873 F.3d 251 (4th Cir. 2017). "[T]he ALJ must 'build an accurate and logical bridge from the evidence to his conclusion that [the claimant's] testimony was not credible. . . .'" <u>Id.</u> at 269 (quoting <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016)). In <u>Brown</u>, the court held that the ALJ erred by discounting the claimant's credibility based upon daily activities without acknowledging the limited extent of those activities as described by Brown or explaining how those activities showed that he could sustain a full-time job. <u>Id.</u> The court also found that the ALJ erroneously relied upon his own observations and medical judgments in finding that Brown's pain was not as limiting as he claimed because Brown could sit through the ALJ's hearing, take a psychological test, and manage his own money. <u>Id.</u> at 271. Furthermore, the court determined that the ALJ impermissibly failed to address conflicting medical evidence and explain how it affected his conclusions. <u>Id.</u>[3]

Here, the Commissioner argued that the ALJ's comprehensive, eleven-page summary of the medical evidence was sufficient. The ALJ's concise explanations following that summary are sufficient, the Commissioner argues, because taken in the context of her decision as a whole, the ALJ connects the comprehensive medical records summary to her specific findings. For example, regarding domain two, the ALJ stated that "the majority of visits show the claimant attended well and was easily redirected," "[r]ecords do not suggest the claimant was easily

---

[3] <u>Brown</u> primarily involved evaluation of treating sources' opinions and the claimant's credibility, but Jacob's counsel here correctly argues that its "logical bridge" holding is relevant for any ALJ analysis.

distracted or had issues with focus," and "[o]verall . . . the record does not support any limitation here." R. 81. Seemingly, this builds the necessary logical bridge. The inquiry does not end, however, as substantial evidence must still support the ALJ's decision. While an ALJ may build a bridge from the evidence to her conclusion, the ALJ's analysis may still be deficient if substantial evidence does not ultimately support that conclusion.

Another court in this District has interpreted Brown as concluding that an ALJ fails to build the requisite logical bridge when he mischaracterizes conflicting evidence and the medical record. Brown v. Berryhill, Civil Action No. 7:16-cv-00404, 2018 WL 1439602, at *3 (W.D. Va. Mar. 22, 2018). Other courts have noted that the Fourth Circuit's concern in Brown was that the ALJ's opinion was not consistent with the record medical evidence; consequently, because the ALJ failed to adequately address that objective evidence, his explanations for his conclusions regarding the treating sources and the claimant's credibility were deficient. See Kidd v. Berryhill, Civil Action No: 6:17-cv-3, 2018 WL 1163463, at *5 (W.D. Va. Feb. 13, 2018) (holding the ALJ sufficiently explained the objective medical evidence in giving less weight to the claimant's subjective complaints, and built a logical bridge to his conclusion to give more weight to non-treating source opinions because those opinions were more consistent with the record than the treating physician's). Accordingly, in providing a summary of the medical evidence, followed by a summary paragraph illustrating how the ALJ reached her conclusion from that evidence, the ALJ  may build the requisite logical bridge. Here, however, the ALJ's summary of the medical evidence is inaccurate and inconsistent. The ALJ failed to accurately address the significant conflicting evidence in her summary and mischaracterized the objective medical evidence, which makes the summary and her "logical bridge" inaccurate. Thus, I find that substantial evidence does not support the ALJ's decisions regarding the three domains at

issue[4] and, accordingly, remand is warranted.

    2.   <u>Domain Two: Attending and Completing Tasks</u>

Jacob argues that the ALJ impermissibly ignored evidence from G.G.'s occupational

therapy sessions, which document G.G. having to be directed and re-directed at each session.

Pl.'s Br. at 35, Dkt. 16. As a result, substantial evidence does not support the ALJ's conclusion

in this domain. <u>Id.</u> The Commissioner counters that G.G.'s inattentiveness was normal for his

age and the records show that he was easily redirected during his occupational therapy sessions.

Def.'s Br. at 6, Dkt. 21.

In the domain of attending and completing tasks, the Commissioner considers how well

the child is able to focus and maintain attention and how well he is able to begin, carry through,

and finish activities, including the child's pace at which he performs activities and the ease with

which he changes activities. <u>See</u> 20 C.F.R. § 416.926a(h) (amended Mar. 27, 2017). An older

infant or toddler, defined as one to three years old, with no impairment, should be able to attend

to things that interest him, and have adequate attention to complete some tasks by himself. <u>Id.</u>

§ 416.926a(h)(ii). As a toddler, the child should demonstrate sustained attention, such as when

looking at picture books, listening to stories, or building with blocks, and when putting on his

clothes. <u>Id.</u> A preschool-age child, defined as three to six years old, without impairment, should

be able to pay attention when spoken to directly; sustain attention to play and learning activities;

and concentrate on activities like assembling puzzles or completing art projects. <u>Id.</u>

§ 416.926a(h)(iii). The child should be able to focus long enough to get his clothes together and

dress himself, feed himself, and put away his toys. <u>Id.</u> The preschooler should also be able to

---

[4] While Jacob does not raise the issue in his brief, the ALJ's analysis of domain three (interacting and relating with others) appears, on its face, that it may also suffer from similar deficiencies.

wait his turn and change his activity when instructed to do something else. Id.[5]

In evaluating the effects of a child's impairments on his functioning, the SSA considers relevant sources from early intervention programs, including physicians or physical, occupational, or speech language therapists. Id. § 416.924a(b)(7)(i) (amended Mar. 27, 2017). The SSA also considers information from relevant preschool or school sources, including teachers and school psychologists, or from those who complete comprehensive assessments for intervention or special education services. Id. § 416.924a(b)(7)(i), (iii).

The ALJ's discussion of this domain consists of four paragraphs explaining the standards for analyzing the evidence to determine whether a limitation exists in this area. R. 81. The ALJ then analyzes the evidence in only five sentences, finding that G.G. has no limitation in attending or completing tasks. Id. The ALJ explained,

> [T]he majority of visits show the claimant attended well and was easily redirected. The consultative examiner noted the claimant's concentration was normal and his pediatrician stated she felt much of claimant's behavior was age appropriate. Records do not suggest the claimant was easily distracted or had issues with focus. They also do not contain evidence he was [easily] frustrated or abandoned tasks. Overall, the claimant's behavior is consistent with his age and the record does not support any limitation here.

Id. (citations omitted).

The ALJ's five brief sentences, even though they demonstrate how she reached her conclusion, still leave me to guess at how she found no limitation in this domain. The record is replete with mentions of G.G.'s inability to stay on task and hyperactivity. G.G. was attending early intervention occupational therapy on a weekly basis, and records from those sessions all the way up through October 2016 demonstrate that G.G. had consistent problems with attending and completing tasks. For example, G.G. needed consistent redirection for task (R. 1251, 1254); was unable to follow through with a simple task without constant verbal cues (R. 1380, 1382, 1384);

---

[5] G.G. was three years old at the time of the hearing and the ALJ's decision.

would not have been able to complete simple three-step tasks without prompts and moderate

assistance (R. 1373, 1377); required moderate to maximum cues or assistance to stay on task,

follow directions, or complete an activity (R. 1394, 1396, 1410, 1412, 1418, 1419, 1422, 1432);

would not follow directions (R. 1388); would not return to task from off-task behavior without

verbal reminders (R. 1382); required multiple redirections (R. 1392); and was easily distracted

with decreased attention to task (R. 1432). G.G. was three years old during those therapy

sessions, and a child of that age should be able to pay and sustain attention and concentrate on

activities. Thus, I do not find that substantial evidence supports the ALJ's finding that there is

absolutely no limitation in this domain, as she is incorrect in stating that "the majority of visits

show the claimant attended well and was easily redirected." R. 81.

In Brown v. Commissioner, the Fourth Circuit criticized that ALJ for relying on "cherry-

picked evidence," which was "skewed" to contradict the claimant's treating physicians'

opinions. 873 F.3d 251, 267 (4th Cir. 2017). The court also noted that the ALJ would emphasize

portions of a doctor's statement or assessment but would fail to acknowledge the remaining

pieces that did not support his conclusion or his own judgments. See id. at 265. Here, the ALJ

discussed only pieces of statements from G.G.'s pediatrician and the consultative examiner,

specifically ignoring those other pieces that did not support her conclusion. The Smyth County

Schools evaluations also contained indications of issues in this domain, which, in addition to all

of the OT records, directly contradict the ALJ's conclusive statement that "[r]ecords do not

suggest the claimant was easily distracted or had issues with focus."

The records reflect that, at many Kidz at Play sessions, G.G. worked with more than one

therapist. The ALJ omitted the records from the therapist whose reports conflicted with the

ALJ's finding of no limitation in this domain, and thus the ALJ's explanation of the OT records

paints an incomplete and inaccurate picture. The ALJ cannot accurately conclude, based on her summary of the medical evidence, that "the majority of visits show [G.G.] attended well and was easily redirected" when the ALJ did not even discuss the significant number of visits that conflicted with that conclusion.

For example, the ALJ described that at G.G.'s July 13, 2016 appointment, G.G. required "minimal redirection on physical tasks and was able to sustain attention for more than five minutes without verbal cues" (R. 77), while one of the therapist's notes from that day read, "During a language activity, [G.G.] required mod[erate]-max[imum] visual and verbal cueing to follow 2-[s]tep related commands," and G.G. "required max[imum] visual and verbal cues to complete a listening activity" (R. 1396). On July 20, 2016, the ALJ stated that G.G. "did well with directions and sequencing for all tasks" (R. 77), whereas the therapist reported G.G. needed moderate visual and verbal cueing to complete a language activity, during which he followed visuals only 25% of the time, and required maximum visual and verbal cues to complete a listening activity (R. 1394). On September 7, 2016, the ALJ stated G.G. "participated in all tasks" and "demonstrated [g]ood coordination and only required minimal assistance" (R. 78–79), but one of the therapist's notes stated that G.G. "is unable to follow through with a simple task without constant verbal cues" (R. 1384). The ALJ did not make any mention of any comments relating to G.G.'s attentiveness for his September 22 and 28, 2016 appointments (R. 79), but one of G.G.'s therapists stated G.G. "would not return from an off task behavior" on September 22, returned from an off task behavior only three out of ten times on September 28, and was "unable to follow through with a simple task without constant verbal cues" on both days (R. 1380, 1382). These listed examples represent only some of the instances in which the ALJ's characterization of an OT appointment is incongruous with the record because she fails to address the

unfavorable reports from the second therapist.

Furthermore, the ALJ does not explain her considerations of statements from G.G.'s pediatrician, the consultative examiner, or school officials. G.G.'s pediatrician indicated that G.G.'s coordination problems were due to his "inability to stay focused on one thing" and emphasized G.G.'s continued need for therapy. R. 1238. The pediatrician also wrote that many of G.G.'s problems were "appropriate for age," but the ALJ failed to explain why she credited one part of the pediatrician's statement and not the others.

The ALJ mentioned briefly that the consultative examiner "noted the claimant's concentration was normal." R. 81. However, the consultative examiner stated that G.G.'s chief problems included restlessness and hyperness. R. 1352–53. Dr. Thomson diagnosed G.G. with ADHD and autism spectrum disorder, and in explaining those diagnoses, he determined G.G. "exhibits signs and symptoms of hyperactivity but [his] attention seems to be normal." R. 1354. The ALJ simply fails to explain why she credited one part of the consultative examiner's assessment—that G.G. had normal attention or concentration—but not the many others indicating that G.G. had issues with attention and hyperactivity. Furthermore, the ALJ incorrectly stated that "the examination was performed without difficulty." R. 78. This assertion is false: Dr. Thomson stated that the exam was difficult to perform because G.G. was restless, hyper, and did not like to be touched. R. 1353. While this one mistake may seem trivial, the fact that the ALJ misconstrued the entire tenor of the examination skews its effectiveness in supporting her ultimate conclusion and portrays potentially conflicting evidence as if it did not actually contradict her conclusion.

Finally, the ALJ did not discuss the complete findings made during G.G.'s Smyth County Schools assessment. While the school board ultimately determined that G.G. would not need

19

special education at that time, there were a number of indications in that assessment that G.G.

may have had difficulties with attention. For example, the speech therapist determined that G.G.

was distractible but cooperative, and noted that G.G. "showed some decreased attention to task

with a moderate need for redirection" and "needed constant redirection to task" as the evaluation

continued. R. 790. The school psychologist also determined that G.G. was "at-risk" for

hyperactivity. R. 804. The ALJ again credited only those findings from the examiners that

supported her ultimate conclusion.

While it is not for this Court to re-weigh the evidence, I cannot conclude that substantial

evidence supports the ALJ's determination that G.G. suffers from no limitation in the domain of

attending and completing tasks. The ALJ's explanation is deficient for failing to explain why she

discounted voluminous OT evidence and how she weighed relevant opinion evidence. See

Monroe v. Colvin, 826 F.3d 176, 191 (4th Cir. 2016) (holding that nonspecific explanation of

weight assigned to each opinion precludes meaningful judicial review); see also Caldwell o/b/o

A.C. v. Berryhill, Civil Action No. 7:16-CV-135, 2017 WL 2964898, at *4 (W.D. Va. June 14,

2017) (finding ALJ's opinion "legally deficient" when failing to address the weight given to any

medical opinion evidence in evaluating the attending and completing tasks domain).

3. Domain Five: Caring for Yourself

Jacob asserts that substantial evidence does not support the ALJ's determination that

G.G. has no limitation in the domain of caring for himself. He argues that the ALJ erroneously

concluded that the record "is not reflective of any abnormalities in this domain" because G.G.

requires significant supervision and redirection in order to adequately care for himself. Pl.'s Br.

at 36–37, Dkt. 16. The Commissioner argues that substantial evidence supports the ALJ's finding

because G.G.'s ability to feed himself was improving with therapy, G.G. did not engage in self-

harming behavior, and the consultative examiner determined G.G. had overcome his developmental delays. Def.'s Br. at 8–9, Dkt. 21.

In analyzing a child's ability to care for himself, the SSA considers how well the child maintains a healthy emotional and physical state, including how well the child gets emotional and physical wants and needs met; how the child copes with stress and environmental changes; and whether the child takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). A child's ability in this domain includes using his independence and competence to meet his physical needs, such as feeding, dressing, toileting, and bathing appropriately for his age. Id. § 416.926a(k)(1)(ii). For older infants and toddlers (ages one to three), the child should be trying to do more things himself, showing some contrariness, and learning to cooperate with caregivers in taking care of physical needs. Id. § 416.926a(k)(2)(ii). Preschool children (ages three to six) should be independent in most day-to-day activities, and should begin to understand how to control behaviors that are not good for them. Id. § 416.926a(k)(2)(iii). Some examples of a child's limited functioning in caring for himself may include experiencing disturbances in eating or sleeping patterns. Id. § 416.926a(k)(3).

The ALJ summarily concluded that G.G. has no limitation in caring for himself because "the record is not reflective of any abnormalities." R. 85. Taking this statement at face value, the ALJ completely ignored that the record is replete with indications that G.G. is unable to feed himself appropriately, or even safely. Regarding G.G.'s feeding habits, the ALJ explained simply that "the claimant was able to feed himself appropriately" and "did not engage in any injurious behavior to himself." Id. The ALJ also stated that the consultative examiner noted that Susan reported G.G. could feed himself, dress himself, and brush his teeth. Id.

The ALJ again mischaracterized the evidence by cherry picking and skewing the

objective medical evidence. Most significantly, the ALJ failed to accurately explain the Kidz at
Play therapy records. G.G. underwent two evaluations for the beginning of his Kidz at Play
therapy in March 2016: one for behavior and development, and the other for eating. The ALJ
adequately summarized the first evaluation, but omitted completely the second feeding
assessment—the evaluation that contained objective evidence that conflicted directly with the
ALJ's conclusions. The therapist, after a feeding assessment during which she observed G.G.'s
functioning, determined G.G. presented with oral phase dysphagia. R. 1279. She determined that
G.G. "must be constantly supervised when eating as he has no impulse control to manage a bolus
and will fill his mouth with a bolus until he gets choked," and that G.G. "has to be heavily paced
when drinking from a straw or open cup as he will slurp the liquids and get strangled on them."
R. 1278–79. The therapist ultimately concluded that G.G. "is at risk for choking and/or aspiration
due to poor bolus control and low oral muscle tone." R. 1279. The ALJ fails entirely to discuss
this objective assessment which conflicted with her conclusion that G.G. has no limitation
whatsoever in caring for himself.

   The ALJ continued to downplay the severity in G.G.'s eating abilities demonstrated
throughout the OT records. In her medical evidence summary, the ALJ described each OT
session, but too frequently mischaracterized or omitted information from those sessions that
contradicted her ultimate conclusion. For example, the ALJ reported a few visits as showing that
G.G. had been improving, but failed to note the more numerous visits showing that G.G. still had
significant difficulties with eating and drinking. For the weekly visits from June through
September 2016, the ALJ only mentioned G.G.'s feeding therapy three times when she stated:
"[G.G.] self-fed appropriately seventy-five percent of the time"; G.G. "continued to require
visual and verbal reinforcement to take appropriate bite sizes"; and G.G. participated well in his

22

feeding trials. R. 77–79. These statements were accurate. R. 1396, 1430. Throughout those four

months, however, G.G. continued to display significant issues in feeding himself at almost all of

the other appointments. Specifically, G.G.: required moderate to maximum cues to appropriately

take bites (R. 1251, 1388); overstuffed his mouth 60% of the time and selected appropriate bite

sizes 30% of the time (R. 1255); overstuffed his mouth every time he took a bite (R. 1399,

1401); continued to require reinforcement for pacing to not overstuff his mouth (R. 1394, 1396);

had to use his finger to manage a bolus from a hard solid food (R. 1386); overfilled his mouth

(R. 1409); required several cues to not overfill his mouth when drinking (R. 1416); and did not

follow pacing cues, resulting in G.G. choking on liquids twice (R. 1392). The ALJ did not

adequately address this conflicting evidence from G.G.'s OT records, as they seem to

demonstrate that G.G. could not eat or drink safely without supervision. Overall, throughout the

entire period of time accounted for in the record, G.G. had regular difficulties during his weekly

appointments with: figuring out the correct bite size (R. 1255, 1257, 1273, 1394, 1396, 1399,

1422, 1430); drinking liquids and swallowing at an appropriate rate without coughing, choking,

or "strangling himself" (R. 1251, 1257, 1259, 1273, 1380, 1388, 1392, 1430); and impulsive

eating and/or over-stuffing his mouth (R. 1251, 1255, 1257, 1271, 1273, 1388, 1392, 1394, 1396,

1399, 1401, 1416).

　　　It is important to note that this Court is not requiring an ALJ to list every single therapy

visit a claimant may have, along with the complete treatment notes for each visit. But if an ALJ

chooses to describe those records in detail, she contravenes Brown when she mischaracterizes

the reports of those visits, fails to include a substantial number of records containing conflicting

evidence, and cherry picks which records to include in order to come to the conclusion that the

ALJ may think is correct, but that may nevertheless not be supported by substantial evidence.

The ALJ's lack of explanation regarding the relevant medical opinion evidence or notes from G.G.'s therapists and doctors, like in domain two, similarly plagues this domain's analysis. The ALJ again failed to explain why she cited one piece of the consultative examiner's report and not another. The consultative examiner noted Susan's report of G.G.'s behavior, but he also described that G.G. "has difficulty with swallowing, mostly liquid food." R. 1352. He also diagnosed G.G. with swallowing dysfunction, and noted that G.G. is "[u]nable to tolerate liquid products without choking [and] needs [] thicker products." Id. The ALJ did not explain why she relied on a report from Susan made during the consultative examination, but not on the consultative examiner's diagnoses and statements themselves.

G.G.'s pediatrician, therapists, and school examiners all consistently reported abnormalities in G.G.'s eating and drinking habits. G.G.'s pediatrician regularly discussed G.G.'s vomiting, gagging on food, and coughing on liquids. R. 1062, 1071, 1075. In fact, she ordered a barium swallow test, which showed oropharyngeal swallow disfunction. R. 1078. Additionally, upon establishing care in Virginia, G.G.'s pediatrician diagnosed him with feeding disorder of infancy or early childhood. R. 1095. The subsequent therapy records demonstrate that G.G.'s issues with eating, drinking, chewing, and swallowing persisted.

As part of G.G.'s Smyth County Schools evaluation, the evaluating speech therapist determined that G.G. "has difficulty with biting and chewing food completely . . . overstuffs his mouth . . . [and] vomits quite often after eating." R. 791. The social worker noted that G.G. can feed himself with a spoon and fork and drink out of a regular cup, but he will get choked when he takes a drink at times, and will drink slowly only "if reminded to do so."[6] R. 785. The ALJ

---

[6] The social worker also noted that G.G. needs assistance with most aspects of getting dressed because of his cerebral palsy. R. 784. The regulations state that not being able to dress appropriately could indicate limitations in a child's functioning. 20 C.F.R. § 416.926a(k)(3).

failed to address the reports that indicate G.G. cannot eat or drink properly without supervision,

and needs minimal to constant cues to feed himself in a safe manner.

> In describing the Smyth County Schools evaluations, the ALJ stated:

> Testing showed the claimant was functioning in the average range of intelligence. When seen for a speech language assessment, he was noted as distractible, but cooperative and friendly. His speech and language skills were found to be within normal limits. Physical therapy services also were not recommended, as his gross motor skills were generally appropriate for his age. Some delays were noted in fine motor and sensory processing.

R. 75. When presented with the full findings, however these evaluations paint a much different

picture. The examiner for the speech language assessment[7] noted G.G.'s speech and language

skills to be within normal limits, which the ALJ described, but the ALJ again omitted the

examiner's specific comments. The examiner reported that G.G. had difficulty with biting and

chewing, overstuffed his mouth, vomits quite often after eating, can drink from a straw with

pacing, and had difficulty with food textures. R. 791. Additionally, regarding the OT evaluation,

the ALJ stated that some delays were noted in fine motor and sensory processing. This

understates the results of that examination, which revealed that G.G. had the lowest sensory

processing measure (definite dysfunction) in visual, hearing, touch, body awareness, and

balance, resulting in an overall definite dysfunction in sensory processing. R. 798. The ALJ

recognized that G.G. did not receive special education services at that time, but omitted relevant

and specific medical opinion evidence to mischaracterize the outcomes of the assessments.

In the ALJ's short analysis of domain five, she cites the Social Security regulations that

state not feeding at age-appropriate levels could be a potential indication of difficulty in this

domain. R. 84. The record is replete with reports that G.G. cannot feed himself at an age-

[7] Relevant to domain two, this examiner also reported that G.G. showed "some decreased attention to task with a moderate need for redirection," and "needed constant redirection to task" as the evaluation progressed. R. 790. The ALJ only reported the examiner's comment that G.G. was distractible, but cooperative and friendly. R. 75.

appropriate—much less safe—level, and thus substantial evidence does not support the ALJ's

finding that G.G. has absolutely no limitation in this area. I cannot find that substantial evidence

supports the ALJ's decision absent greater analysis of how G.G.'s complete treatment records

and accurate source opinions impact the assessment of this domain. See Mascio v. Colvin, 780

F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to

guess [at] how the ALJ arrived at his conclusions").

    4.   Domain Six: Health and Physical Well-Being

    Jacob argues that the ALJ failed to explain how she determined that G.G. has less than

marked limitation in this domain. He alleges that the record evidence establishes G.G.'s severe

impairments, which interfere with his physical functioning and require frequent therapy and

intensive medical care to maintain his health and physical well-being. Pl.'s Br. at 38, Dkt. 16.

    The ALJ recited the Social Security regulations and summarily concluded—in only two

sentences—that G.G. has less than marked limitation in this domain. The ALJ stated, "[T]he

claimant has multiple medical conditions that have required ongoing medication management

and treatment with specialists. Based on the need for continued treatment and monitoring, the

undersigned finds the claimant has a less than marked limitation here." R. 85.

    The fact that there is virtually no description of any medical or opinion evidence,

testimony, or application of law to facts obviates the need for a protracted discussion as to how

the ALJ failed to build an adequate bridge between the evidence and her conclusion in this

domain. The ALJ lacks any analysis here and her explanation is so deficient that it frustrates

meaningful review. See Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). I cannot find that

substantial evidence supports her domain six determination.

    Overall, although the ALJ may conclude again that G.G. is not disabled, I cannot find

that substantial evidence supports her decision. Remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at [her] conclusions"). Even though the ALJ did provide a comprehensive medical summary, she repeatedly mischaracterized the objective medical record and improperly cherry-picked evidence. Because I do not find that substantial evidence supports the ALJ's determinations regarding G.G.'s domains of functioning, remand is warranted.[8]

## CONCLUSION

It is not the province of the Court to make a disability determination. The Court's role is limited to determining whether substantial evidence[9] supports the Commissioner's decision. In this case, the ALJ failed to satisfy her duty of explanation, and meaningful judicial review is impossible. For the foregoing reasons, I recommend **GRANTING** Jacob's Motion for Summary Judgment, **DENYING** the Commissioner's Motion for Summary Judgment, and **REMANDING** this matter for additional consideration under sentence four of 42 U.S.C. § 405(g).

The Clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file

---

[8] Jacob asserts an additional ground for remand in his motion for summary judgment, namely, that the ALJ did not properly assess the subjective allegations of impairment. Upon remand, the ALJ should consider that issue.

[9] Jacob submitted additional records to the Appeals Council after the ALJ entered her decision. I have not considered that evidence here because the record that was available to the ALJ provides a sufficient basis on which to review her decision.

specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Entered:  February 26, 2019

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge